# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

STEVEN KAUFMAN,

        Plaintiff,                          CASE NO.: 1:26-cv-21560-LEIBOWITZ

        v.

MIAMI-DADE SHERIFF'S OFFICE, and
MIAMI-DADE COUNTY, FLORIDA

        Defendants.

_____/

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL[1]

Plaintiff, STEVEN KAUFMAN (hereinafter referred to as "Plaintiff" and/or "Mr. Kaufman"), by and through his undersigned counsel, hereby complains of Defendants, MIAMI-DADE SHERIFF'S OFFICE ("MDSO"), and MIAMI-DADE COUNTY, FLORIDA ("COUNTY"), (hereinafter collectively "Defendants") and alleges as follows:

### INTRODUCTION

1.     Plaintiff brings this action under the Florida Civil Rights Act of 1992, § 760.01, *et seq.*, Florida Statutes ("FCRA"), Miami-Dade Code of Ordinances 97-17, Article IV, Chapter 11A, *et seq.* ("MDCO"), the Florida Whistleblower Act ("FWA"), Fla. Stat. §§ 112.3187–112.3189, the Miami-Dade County Employee Protection Ordinance ("EPO"), and the Florida Public Records Act ("FPRA") to redress discrimination and retaliation committed by Defendants.

2.     Plaintiff is a veteran Jewish, Caucasian, male officer with over two decades of service to MDSO. He has consistently performed his duties with distinction but has suffered

---

[1] Pursuant to Federal Rule of Civil Procedures 15(a)(2), Plaintiff hereby represents that Defendants' counsel does not oppose the filing of this Second Amended Complaint. *Cf.* ECF No. 6 at 2.

repeated acts of discrimination and retaliation because of his religion, race/national origin, sex, and his whistleblowing disclosures.

3.     Plaintiff seeks reinstatement to his prior post, expungement of retaliatory discipline, back pay and front pay, compensatory damages, attorneys' fees and costs, and other relief as the Court deems proper.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this matter pursuant § 34.01(c), Florida Statutes, because this action seeks damages greater than $50,000.00, exclusive of interests, fees, and costs.

5.     Venue is proper in the Eleventh Judicial Circuit of Florida under § 47.011 and § 47.041, Florida Statutes, because the causes of action accrued and arose in Miami-Dade County, Florida.

6.     This Court has jurisdiction pursuant to Article V, § 5(b) of the Florida Constitution and Fla. Stat. § 26.012 (2)(a), which grants circuit court's jurisdiction over civil actions at law not cognizable in county courts.

## PARTIES

7.     Plaintiff Steven Kaufman is a white male of Jewish faith and a law enforcement officer formerly assigned to the Miami-Dade Sheriff's Office Airport Operations Bureau (AOB). He began working for MDSO in 1996 as a police officer and at all relevant times was classified as a (permanent) Police Officer. He is a member of the Florida Retirement System (FRS) in DROP, meaning his future pension benefits are tied to his salary.

8.     Defendant Miami-Dade County, Florida ("County") is a political subdivision of the State of Florida, and Miami-Dade Sheriff's Office ("MDSO") is a department of the County. Defendants are "public employers" under Fla. Stat. §§760.02(7), 112.3187(2), and County Code

§2-56.28.11. At all relevant times, Defendants employed Kaufman and owed him duties under the statutes and ordinances cited herein.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.      Plaintiff timely filed charges of discrimination and retaliation with the Florida Commission on Human Relations and the EEOC.

10.      Plaintiff received right-to-sue notices and has exhausted all administrative remedies under Fla. Stat. Ch. 760.

11.      Plaintiff has satisfied all administrative requirements applicable to his whistleblower claims under the Florida Whistle-Blower's Act and the Miami-Dade County Employee Protection Ordinance. Consistent with the Ordinance, each of Plaintiff's whistleblower complaints was first reviewed by the designated panel and then submitted to the Miami-Dade Commission on Ethics and Public Trust for a probable-cause determination.

12.      On June 3, 2025, the Ethics Commission issued its final determination on Plaintiff's first whistleblower complaint. On September 25, 2025, the Ethics Commission issued its final administrative decision on Plaintiff's second whistleblower complaint, closing the administrative process in its entirety.

13.      Under both the Florida Whistle-Blower's Act governing public employees and the County's Employee Protection Ordinance, a civil action must be commenced within 180 days of the agency's final administrative disposition. September 25, 2025, decision constitutes the operative final decision for purposes of the limitations period. Plaintiff files this action well within the required 180-day window. No further exhaustion is required, and Plaintiff is entitled to seek full relief in this Court.

14.     Under both the Florida Whistle-Blower's Act applicable to public employees and the Miami-Dade County Employee Protection Ordinance, a civil action must be filed within 180 days of the final administrative disposition. Plaintiff files this action well within that statutory period. No further agency review is required, and Plaintiff is therefore entitled to pursue full relief in this Court.

15.     This Court has jurisdiction over Plaintiff's claim under the Miami-Dade County Employee Protection Ordinance (Code §§ 2-56.11 et seq.) pursuant to Fla. Stat. § 112.3187(8)(b) (providing for a civil action in court after local administrative remedies). In accordance with the Ordinance, Plaintiff's whistleblower claims were first heard by a panel and then presented to the Miami-Dade Commission on Ethics and Public Trust ("Ethics Commission") for a probable cause determination, as detailed below. Any further exhaustion is not required, and Plaintiff now timely seeks full relief in this Court.

## FACTUAL BACKGROUND

### A. Plaintiff's Early Service and Protected Characteristics

16.     Plaintiff has served with MDSO since 1996. Over the ensuing 27 years, he earned an exemplary record and numerous commendations. He consistently met or exceeded performance expectations in various assignments, including uniform patrol, specialized units, and crisis intervention roles. By 2019, Plaintiff was a highly experienced officer with unblemished evaluations and a reputation for professionalism.

17.     Around the mid-2000s, Plaintiff was selected for the elite Hostage Negotiation Team ("HNT") based on his skills and experience. He served on the HNT for over a decade, responding to critical incidents and successfully resolving numerous hostage and barricade situations without loss of life. As one of the senior negotiators, Plaintiff mentored younger officers

and regularly refreshed his crisis negotiation training. Plaintiff's dedication to the HNT and his institutional knowledge were well known within MDSO.

18.     Plaintiff's Jewish faith and Caucasian, non-Hispanic identity were well known to his supervisors and peers.

**B. 2019: Removal from Hostage Negotiation Team**

19.     Around March 2019, Plaintiff was an informed that he was not to respond to call until further notice in his role as an active member of the Special Response Negotiation Team, which carried a 5% pay incentive and was only provided with the reason that it was at the request of his commanding officer, which at was Nuñez.

20.     Plaintiff was the only Jewish negotiator on the team where diversity was a stated goal and was utilized to negotiate on a wide range of situations and specialized with negotiating with Jewish individuals.

21.     Despite his exemplary performance record, Plaintiff was abruptly removed from the Hostage Negotiation Team ("HNT") by Nuñez, the Defendants' Southwest District Commander. The removal occurred without warning, explanation, or any performance-based justification. Plaintiff had never been subject to any disciplinary action or negative evaluation during his tenure on the HNT. When informed of his removal, Captain Nuñez told Plaintiff that: *"You were making too much money."* The Plaintiff mentioned that he was the only Jewish person on the team and played a required role and that was one of the reasons why he was selected for the team. Nuñez responded "*I don't care and I don't want you on the team, and no Jews are going to need to be saved by you,*" thus making clear that Plaintiff's Jewish identity was the motivating factor behind the decision. This action effectively constituted a demotion from a prestigious and specialized assignment to general duty, causing both professional and reputational harm.

5

22.     Plaintiff recalls telling Nuñez: *"I'm not Latin and you want Latins?"* His response was "if the Jews can stick together, the Latins can stick together".

23.     Around May 2019, the Plaintiff received a memorandum stating he was "transferred out of negotiation… effective immediately" with no explanation and no disciplinary charges. When Plaintiff inquired why he was being removed, he was simply told it was "because of your captain" and the 5% pay incentive was removed.

24.     Notably, Plaintiff had already been reassigned out of Nuñez's command in Homeland Security, so the justification was pretextual. In short, the transfer order was a summary adverse action taken for discriminatory reasons at Nuñez's behest.

25.     Removal from the Team immediately cut Kaufman's pay and prospects. He lost the 5% hostage-negotiator incentive and became ineligible for lucrative overtime details.

26.     Beyond pay, Kaufman's career stalled. He was "basically blacklisted," unable to obtain even assignments for which he was eminently qualified. For example, Kaufman applied for a coveted 10% pay-increase Field Training Officer position and a K-9 handler slot, but each time those roles were inexplicably given to much less experienced, non-Jewish, non-male applicants. Other negotiators who remained (all Hispanic or Black) continued to benefit from overtime details and advancement opportunities.

27.     In fact, the Union representative Dan Howard noted: *"Why do the white guy and the black guy get written up and none of the Latins did?"*

**C. 2022–2023: DAR and Written Reprimand**

28.     In 2021–2022, MDSO conducted an internal audit of officer overtime usage at Miami International Airport. The audit identified Plaintiff as one of several officers who had allegedly exceeded overtime limits or violated related policies. On or about February 22, 2022,

MDSO finalized a Disciplinary Action Report ("DAR") against Plaintiff (Control No. 2021-13058-16166) for overtime violations. The DAR imposed a Written Reprimand as discipline. Plaintiff, a 25-year veteran officer with a clean record, was formally charged with violating departmental rules regarding overtime and obedience to orders.

29.     Plaintiff contested the allegations and sought to gather information in his defense. Beginning in 2022, Plaintiff, often through his police union representatives, made public records requests to obtain relevant documents, including the full internal overtime audit and any overtime policy exemptions that had been granted to other officers.

30.     For example, the police union requested a copy of the entire overtime audit report, but MDSO did not provide it prior to Plaintiff's disciplinary appeal hearing. Plaintiff persisted in requesting these records through Florida's Public Records Act. The documentation he sought was directly relevant to whether he had violated any policy or whether management had authorized exceptions to the overtime rules.

31.     Around August 20, 2022, although a certified instructor in First Responder and CPR, Plaintiff, was banned from teaching at the Airport District, effective immediately.  He was also removed as a driving instructor and barred from working overtime assignments.

32.     When Plaintiff questioned the bans to Lt. Maldonado and Sgt. Meagher, he was told that it was at the direction of Captain Nuñez.

33.     On October 12, 2022, Plaintiff exercised his rights under County procedures to appeal the Written Reprimand. An administrative review hearing was held, at which Plaintiff appeared with his union to challenge the DAR. At the hearing, evidence emerged that a high-ranking officer, Captain Raul Jaimie Nuñez ("Nuñez"), had sent an email on July 12, 2021, effectively lifting the "64-hour" overtime cap for all Airport District staff, without requiring

individual approval memos. That email had been addressed to another supervisor and stated: "*I approve the Airport staff to go over the 64-hour rule until further notice. No memo is required*.". Plaintiff argued that he and others reasonably believed this email authorized their overtime, and that he was being singled out for discipline despite widespread practice.

34.    Due to MDSO's failure to disclose the full audit and related records before the hearing, Plaintiff's ability to defend himself was hampered. Lieutenant J.C. Rodriguez ("Rodriguez") testified that the union had requested a copy of the entire overtime audit at some point, but it "was not provided prior to the hearing." Indeed, at the time of the October 2022 appeal, MDSO had not provided the list of all officers who violated the 64-hour rule. Nor had it provided other documents Plaintiff requested under Chapter 119, Florida Statutes. MDSO proceeded with the hearing without these records, over Plaintiff's objection.

35.    Following the hearing, on January 9, 2023, Assistant Director Rosanna Cordero-Stutz issued a written decision upholding the Written Reprimand against Plaintiff. In her memorandum, AD Cordero-Stutz acknowledged the existence of Captain Nuñez's July 2021 "64-hour rule" email and noted that a reasonable person "would believe that it applied to the entire Airport staff." She also acknowledged the audit list had still not been provided to the union.

36.    Nevertheless, the decision concluded that even if others violated the rule, Plaintiff had violated it too; it found Plaintiff exceeded overtime limits for 8 consecutive pay periods and failed to submit required approval memos. January 9, 2023, memorandum confirmed the Written Reprimand as final discipline, subject to any further grievance. Plaintiff received this decision by email on or about January 12, 2023, and returned to work on January 15, 2023, at which time he became aware of the decision.

37. Plaintiff timely pursued the County's Career Service grievance procedure to continue challenging the unfair reprimand. On January 22, 2023, within the allowed timeframe, Plaintiff notified his supervisor in writing of his intent to grieve AD Cordero-Stutz's decision. He then filed a formal Employee Grievance Form alleging that the reprimand was issued without all facts and that the decision was erroneous. Villalba, the Airport District commander, issued a written response denying the grievance on procedural grounds, asserting that the Assistant Director's decision was "final and binding" under the union contract and claiming Plaintiff's grievance was untimely. Villalba's response failed to address the substantive facts of Plaintiff's grievance, including the newly obtained evidence showing Plaintiff's overtime had been within policy limits for officers on leave.

38. Plaintiff escalated his grievance to the next step. In a written rebuttal dated February 2023, Plaintiff pointed out that he had met all deadlines and that Villalba had ignored the merits of his appeal. Plaintiff formally requested to proceed to a Division Director level review. While that grievance was pending, Plaintiff was simultaneously working to obtain the records that had been withheld.

39. In early 2023, after the internal appeal, Plaintiff submitted a renewed public records request for the overtime audit report and related documents. MDSO ultimately produced the requested documentation to Plaintiff and his union representative in spring 2023, in response to Plaintiff's persistence.

40. Specifically, by April 2023, Plaintiff obtained: (a) the "Entity Overtime and Off-Duty Exceeding 64 Hours Report" listing all officers who exceeded the overtime cap, and (b) a memorandum dated March 17, 2023, from Director Alfredo "Freddy" Ramirez III clarifying the overtime policy. Director Ramirez's memo directed that the department's manual be revised to

conform to the Collective Bargaining Agreement ("CBA") provision permitting up to 160 hours of off-duty work in a pay period if the officer is on leave.

41.     Notably, the CBA language allowing such overtime was in effect during the period of Plaintiff's alleged infractions. The records also showed that Plaintiff had in fact used compensatory and annual leave hours to work off-duty details, consistent with the CBA's allowance. In other words, the newly obtained documents demonstrated that Plaintiff's overtime was within the contractual guidelines and that critical exculpatory information had been overlooked in the initial disciplinary decision.

42.     Considering this new evidence, MDSO convened a follow-up meeting on May 1, 2023, to reconsider Plaintiff's Written Reprimand. On June 22, 2023, Assistant Director Cordero-Stutz issued a memorandum rescinding the Written Reprimand in its entirety. The rescission decision expressly acknowledged that important documentation had not been available during the original October 2022 appeal.

43.     Upon review of the overtime records and the Director's clarification memo, the Assistant Director found that Plaintiff's use of leave hours to work off-duty overtime was within the guidelines of the CBA and departmental policy. She concluded that, based on the new presentations and a careful review of the violation, the appropriate outcome was to vacate the Written Reprimand. The rescission memo was copied to Plaintiff, his union, and the Police Legal Bureau, and it directed that Plaintiff's personnel file be cleared of the reprimand.

44.     The June 22, 2023, rescission of the reprimand represented a complete vindication of Plaintiff's position on the overtime issue. However, by this point Plaintiff had already endured nearly a year and a half under the cloud of unjust discipline (from February 2022 to June 2023). He had been forced to resort to Florida's Public Records Act to obtain evidence that should have

been provided as a matter of basic fairness. The County's initial withholding of records and its adversarial stance during Plaintiff's grievance caused him substantial stress and frustration. Nevertheless, Plaintiff's successful use of lawful channels,  internal appeals and public records requests, to clear his name was a protected activity under Florida law, and it set the stage for further retaliation by his superiors, as detailed below.

45.     Separate from the above overtime cap issue, Plaintiff was also subjected to a second disciplinary action in 2022 related to timekeeping and overtime procedures at the Airport. In July 2022, MDSO initiated DAR No. 2022-13395-16481, alleging that Plaintiff had failed to follow proper protocols for reporting and working certain overtime assignments. Specifically, this second DAR accused Plaintiff of: working overtime without taking mandated one-hour breaks between regular shift and overtime, seeking compensation for hours not actually worked (due to including meal breaks), and disobeying a direct order to correct his time records. The charges stemmed from a series of training classes and overtime shifts in February, May, and August 2022.

46.     In one instance, Plaintiff allegedly claimed 9 hours of overtime for a training day that included a 1-hour lunch break, leading to a one-hour overpayment. In another, he allegedly claimed instructor overtime on days he was not actually present as an instructor. The DAR narrative further describes an August 15, 2022, meeting where Plaintiff's lieutenant and sergeant confronted him with discrepancies, and Plaintiff refused to amend his timesheets. MDSO viewed this as insubordination and misconduct and proposed a 5-day suspension as the penalty.

47.     Plaintiff contested the allegations in DAR No. 2022-13395. He maintained that any errors in timekeeping were inadvertent or due to confusing policies, and that he reasonably believed his entries were proper. During the departmental review of this second DAR, Plaintiff

again utilized his rights to respond. The matter underwent the MDSO's multi-level review process in late 2022 and early 2023.

48. Around July 26, 2023, Plaintiff appealed the suspension. Upon appeal, the County Attorney's Office offered to remove the suspension if Plaintiff signed a release of liability waving his right to sue. Plaintiff declined.

49. Ultimately, on August 18, 2023, the MDSO, over the police department's objection, reduced the proposed 5-day suspension to a Written Reprimand (the lowest level of formal discipline), and that five days of back pay would be reimbursed to Plaintiff.

50. Plaintiff prevailed in having this second discipline substantially mitigated, and he suffered no lasting economic loss from the suspension.

51. Despite this reduction, the department refused to remove the DAR from Plaintiff's record and was later used to justify further retaliation.

52. By mid-2023, therefore, Plaintiff had successfully cleared or minimized all formal discipline against him through lawful means: he had his first Written Reprimand rescinded entirely, and his second major charge was reduced to a reprimand with full back pay. These outcomes implicitly acknowledged that the initial actions against Plaintiff were too severe or unfounded.

53. However, Plaintiff's use of protected activities, such as public records requests, internal grievances, and appeals, to challenge management's actions engendered resentment among certain supervisors. Rather than accept that Plaintiff had been vindicated, members of MDSO's command staff began labeling Plaintiff as a troublemaker and seeking ways to retaliate against him for asserting his rights.

**D. Plaintiff's Disclosures of Misconduct and Subsequent Retaliation (2023)**

54. On June 15, 2023, shortly before his first DAR was rescinded, Plaintiff sent an email to Miami-Dade County Mayor Daniella Levine Cava with the subject "*Issues with MDSO and Public Records Request*." In this detailed email, Plaintiff blew the whistle on what he perceived as improper practices and retaliation within MDSO. He raised concerns about how his department and certain employees were handling internal issues, including the delays and obstruction he experienced in obtaining public records. This email to the mayor, who is the head of Miami-Dade County government, constituted a report of "unusual activity, situation, or problem in which the Department would logically be concerned." Plaintiff's direct communication to the mayor, outside his immediate chain of command, was spurred by his belief that the issues he faced (like withholding of records and unjust discipline) were serious and not being remedied internally.

55. Plaintiff's June 15, 2023, email to the mayor was a protected disclosure of mismanagement and possible legal violations. However, MDSO's leadership reacted negatively upon learning of it.

56. Instead of addressing Plaintiff's concerns, the Department initiated corrective action against Plaintiff for allegedly violating the chain-of-command. On July 5, 2023, Major Villalba issued Plaintiff a formal Record of Counseling ("ROC") as discipline for his email to the mayor.

57. The ROC cited Plaintiff for failing to notify or consult his supervisors before reporting issues to an elected official. It invoked department rules requiring employees to report problems through their chain of command and accused Plaintiff of not giving his supervisors an opportunity to resolve his concerns. In essence, Plaintiff was reprimanded on July 5 for going

"outside" the department with his complaints. The counseling memo "reminded" Plaintiff to adhere to chain-of-command.

58.     The Record of Counseling is an adverse personnel action. It is a written rebuke placed in an officer's record. Plaintiff perceived it as retaliation for exercising his First Amendment and statutory rights to petition government. The timing and content of the ROC leave no doubt: it was issued 20 days after Plaintiff's email to the mayor and expressly references that email, titled "Issues with MDSO and Public Records Request."

59.     By issuing the ROC, Major Villalba (and those above him who approved it) effectively punished Plaintiff for disclosing departmental issues to the County's top official. This action had a chilling effect on Plaintiff and other officers, sending the message that whistleblowing outside the department would not be tolerated.

**E. 2023: Whistleblowing, ROC, and Transfer**

60.     Around July 8, 2023, a homeless man named Selwyn Jones was arrested at the Car Rental Center near the MIA train platform. The arrest affidavit alleged that Jones "shoved" Lieutenant Paul Angelo with a cart while exiting the train, constituting Battery on a Law Enforcement Officer. Jones was charged with Battery, Resisting Without Violence, and Trespass, as he had two active trespass warnings.

61.     Plaintiff knew Jones personally and testified he had "never been violent." Plaintiff had reason to believe that this arrest was improper or "a false arrest." The arrestee's conduct did not appear to warrant criminal charges in Plaintiff's view, and he suspected that Lt. Angelo's actions violated the law or departmental policy.

62.     Around July 12, 2023, while on duty, Plaintiff undertook a self-initiated investigation into the July 8 arrest of the homeless individual. The MDSO Standard Operating Procedure, under Chapter 12, Part 1, General Conduct, states in part:

> Duty to report violations of laws, ordinances, rules, or orders: An employee who witnesses or has information or knowledge concerning illegal actions, excessive use of force, dereliction of duty, malfeasance, misfeasance, or unprofessional conduct by any other employee shall report this information to a supervisor or the Professional Compliance Bureau. Some examples of the duty to report include: an officer hears another officer bragging about the use of excessive force or another act of serious misconduct; a citizen provides an officer with cell phone video showing serious misconduct of another officer; or a supervisor reviews a BWC video depicting serious misconduct.

63.     To understand what had transpired, Plaintiff went to the offices of Crystal Mover Services, Inc., the contractor that operates the MIA Mover train's cameras and sought Mr. Steve Garcia ("Garcia"), who manages the surveillance camera system for the MIA Mover Trains, to conduct a preliminary inquiry intended to clarify facts surrounding the questionable arrest. Though not conducting a formal investigation, Plaintiff interviewed Garcia on camera regarding what Garcia witnessed during the July 8 arrest. Plaintiff was wearing and utilizing his departmental body-worn camera (BWC) to record this interview.

64.     The thrust of the statement Plaintiff solicited was that the arrestee had not done anything (no interaction or contact) before being confronted by Lt. Angelo. In Plaintiff's mind, he was documenting evidence to support his belief that the arrest was baseless.

65.     Plaintiff was driven by what he viewed as an urgent need to document the truth of the July 8 incident. However, by orchestrating the statement in this manner, Plaintiff gave the impression of a biased, unapproved investigation into a fellow officer. Something normally handled by the Professional Compliance Bureau (PCB), which Plaintiff had not notified.

15

66.    On the same day, July 12, 2023, shortly after gathering the witness statement, Plaintiff contacted the Professional Compliance Bureau to make an official internal complaint against Lt. Angelo. Plaintiff reported to PCB that he believed Lt. Angelo had made a false arrest on July 8, 2025.

67.    PCB opened an inquiry into Plaintiff's allegations. The very next day, July 13, Plaintiff went to PCB in person and provided a formal sworn statement detailing his allegations against Lt. Angelo. During this statement, Plaintiff candidly admitted that he had conducted his own investigation into the matter. He stated, in substance, *"My thing wasn't to do an investigation. My thing was to look and say, well, what did this guy do."* Plaintiff was not intending to usurp PCB's role, but rather to ascertain the facts because he was concerned about what happened.

68.    MDSO's own Standard Operating Procedure Chapter 15 – Part 04 (Complaint, Counseling, and Discipline) underscores that any *"allegations of police misconduct"* i.e. a Complaint, must be investigated thoroughly and objectively. Thus, the department requires an impartial investigation of every misconduct complaint to both hold wrongdoers accountable and protect employees from false accusations. The SOP further provides that all complaints are to be documented and promptly referred to Internal Affairs for investigation, with a supervisor initially gathering the essential information. For example, upon receiving a complaint, a supervisor "will…receive the information from the complainant" and record it on a Preliminary Complaint Report to determine the urgency of follow-up. The complaint is then forwarded to the Professional Compliance Bureau (Internal Affairs), where it is classified and assigned to an investigator of supervisory rank; statements are taken from the complainant, all witnesses, and the subject employee(s) as part of a full investigation. In short, MDSO's policies mandate a fair,

16

comprehensive inquiry into every complaint, starting with initial fact-finding by a supervisor and culminating in an Internal Affairs investigation.

69.    Plaintiff Kaufman's actions fell squarely within the SOP's sanctioned "Initial Investigation" procedures. Upon learning of possible police misconduct, he took precise steps the policy contemplates: he reviewed and preserved video evidence of the incident, obtained a witness statement from an individual with firsthand knowledge, and immediately notified Internal Affairs to formally document and investigate the matter.

70.    Each of these steps aligns with the department's required practices for handling a complaint in its early stages. Notably, the SOP's investigative standards explicitly require collecting evidence and interviewing witnesses, exactly what Kaufman did. He did not exceed his authority or conduct any "rogue" inquiry; rather, he adhered to the chain of command by securing the evidence and promptly handing the case to Internal Affairs, instead of pursuing any unauthorized criminal investigation on his own. Kaufman's conduct was in full compliance with departmental procedure. He initiated a preliminary inquiry to preserve key evidence and witness testimony, then reported the allegations through official channels for an impartial investigation, as mandated by MDSO policy.

71.    On that day, PCB opened a Contact Report and proceeded to investigate Plaintiff's complaint against Lt. Angelo. However, Defendant also punished Plaintiff. Major Adrian Cummings of PCB reported that Captain Nuñez issued Plaintiff a Written Reprimand under Disciplinary Action Report No. 2023-16968, citing "improper procedures." The reprimand criticized Plaintiff for "initiating his own investigation" without approval and failing to document the encounter properly.

72.     Thus, while Plaintiff followed the SOP to the letter, the department failed to follow its own Complaint procedure in response. Instead of treating the reported misconduct as a legitimate complaint and investigating it impartially, MDSO turned the complaint process into a weapon against the complainant.

73.     In short, the department's response to Plaintiff's report flouted its own SOP: rather than ensuring a fair investigation of the misconduct he reported, the agency improperly targeted Plaintiff through the complaint/disciplinary apparatus. This abuse of the process directly contravened MDSO's written standards and provides important context for the retaliatory animus at issue in this case.

74.     Ultimately, the PCB investigation found no merit to Plaintiff's allegations of misconduct by Lt. Angelo. Instead, PCB concluded that Plaintiff himself had possibly violated multiple departmental policies during his unauthorized investigation. PCB determined that these issues should be addressed by Plaintiff's command at the Airport Operations Bureau (AOB).

75.     The AOB command staff, which included Major Villalba and Captain Nuñez, found Plaintiff's PCB complaint as "meritless and vindictive."

76.     On October 2, 2023, MDSO issued Plaintiff a Notice of Intent to Discipline (5-Day Suspension), signed by Villalba for the events of July 12, 2023.

77.     The October 2, 2023, suspension notice (DAR 2023-16968) is a direct example of retaliation against Plaintiff for his protected whistleblowing activity. At its core, what triggered this discipline was Plaintiff's act of reporting, albeit clumsily, a potential abuse of authority by Lt. Angelo. Plaintiff's methods might be seen as rule violations, but the motive was to expose a possible wrongdoing, a false arrest.

78.     Rather than treating Plaintiff's allegations with objective concern, the Department focused on punishing Plaintiff. The DAR documentation itself reveals a retaliatory mindset: it does not simply say Plaintiff violated procedure; it goes further to impugn Plaintiff's motives as "vindictive." The decision-makers were fixated on the notion that Plaintiff had dared to accuse a superior officer, and they sought to make an example of him. This is the very scenario the Whistle-Blower's Act and related laws are designed to prevent, an employee suffering reprisal for reporting what he reasonably believed to be misconduct.

79.     Other officers, Azcuy, Soto, and Nolasco (all Latin), had committed similar BWC violations in the past and were only counseled.

80.     Before the October 2023 suspension could even be finalized, MDSO's leadership took an even more drastic retaliatory step: removing Plaintiff from his long-held assignment at the Airport.

81.     The Airport assignment is a coveted position that Plaintiff had served in with dedication. However, on August 27, 2023, while the fallout from Plaintiff's complaint against Angelo was unfolding, Captain Nuñez (Airport District) sent an urgent email to MDSO Strategic Response Division Chief Carmen Castro and Major Villalba. The subject was "*Airport Operations Bureau – Officer Steven Kaufman*". In this email, Capt. Nuñez requested that Plaintiff be transferred out of the Airport "immediately," "*For the effectiveness and efficiency of the operation, Officer Kaufman needs to be moved to another assignment.*".

82.     He went on to disparage Plaintiff, stating: *"Officer Kaufman is a constant disruption to the daily operations of the AOB…we need officers that understand the critical mission here."* In essence, a commander of Plaintiff's unit labeled him a disruptive force and sought to oust him from the Airport, a clear punitive measure.

83. The timing and context of Capt. Nuñez's transfer request make its retaliatory nature plain. It occurred just days after Plaintiff's June 23 public records request had been closed on August 20, 2023, and almost immediately after PCB bounced Plaintiff's complaint back to AOB. In other words, right after Plaintiff succeeded in getting records about overtime and right after he accused Angelo and had PCB investigation, his commander decided he must be removed.

84. All of the adverse actions at issue, the Record of Counseling, the Disciplinary Action Report ("DAR"), and Plaintiff's involuntary transfer, preceded or were carried out without any reliance on the PCB's outcome. In other words, Defendants did not wait for the PCB investigation to finish, or for any charges to be substantiated, before taking these actions against Plaintiff.

85. By the time the PCB issued its no-sustained misconduct finding, Defendants had already imposed the counseling memo and DAR and had orchestrated Plaintiff's transfer. This timing makes clear that the discipline was not a good-faith response to any validated wrongdoing by Plaintiff or Lt. Angelo; instead, it was retaliatory, triggered by Plaintiff's act of reporting Lt. Angelo, rather than by the results of any neutral investigation.

86. Moreover, the stated reason that Plaintiff was a "constant disruption" is telling. From Plaintiff's perspective, his "disruptions" were his continual questions, grievances, and whistleblowing activities seeking accountability.

87. Rather than commend an officer for raising concerns about compliance and ethics, the command staff saw Plaintiff as an annoyance to be silenced by banishment.

88. Chief Carmen Castro, upon receiving the request, promptly approved it. On August 28, 2023, Chief Castro emailed Capt. Nuñez: *"We will work on it."*

89. Within days, Plaintiff was involuntarily transferred to a different district/unit in September 2023.

90. This transfer had significant negative impacts on Plaintiff. It removed him from the specialized Airport assignment he had served for years, disrupting his work schedule and career trajectory. It also affected overtime opportunities and other benefits unique to the Airport detail including losing the 5% Airport incentive.

91. The transfer was effectively a demotion in assignment, if not in rank.  It is included in the County Code's definition of "adverse personnel action" as a form of punishment. Indeed, Miami-Dade County's own ordinance explicitly lists a "transfer" as adverse action when done in retaliation. Plaintiff's transfer was exactly that.

92. By early September 2023, Plaintiff found himself ousted from his prior post and facing a proposed 5-day suspension.

93. Around this time Plaintiff took steps to report this pattern of retaliation outside of MDSO. On September 4, 2023, Plaintiff made a public records request specifically seeking documents related to his impending transfer. Plaintiff had become aware of the August 27 Nuñez email and wanted it officially.

94. That request was part of Plaintiff's efforts to prove that his transfer was retaliatory.

95. Around late 2023, Plaintiff filed a formal complaint with the Miami-Dade County Commission on Ethics & Public Trust ("Ethics Commission"). Plaintiff's Ethics complaint alleged that MDSO officials had retaliated against him for engaging in protected activities, including making public records requests and reporting misconduct, and that his involuntary transfer and suspension were the products of unlawful reprisal.

96.     He specifically cited the email evidence from August 27–28, 2023 as proof that his transfer was punitive and not truly for any legitimate "efficiency" reasons.

97.     Around Spring 2025, the Ethics Commission had essentially confirmed the sequence: Plaintiff engaged in protected acts (records requests, outside complaints), and then his leadership swiftly moved to punish him (as evidenced by the email ordering his transfer a week after one such request closed).

98.     Around July 7, 2025, after concluding its inquiry, the Miami-Dade Ethics Commission issued its findings on Plaintiff's complaint. The Ethics Commission determined that while Plaintiff had engaged in protected activity and suffered adverse employment actions, the Commission lacked jurisdiction to grant relief because the matters overlapped with personnel management.

99.     The Commission closed the file without a prosecution, *not* because it found Plaintiff's claims baseless, but because the issues were deemed more appropriate for a court or administrative hearing.

100.    In doing so, the Commission effectively told Plaintiff that he had exhausted the County's whistleblower administrative process and could seek relief in court.

101.    Defendant's actions, as described above, were intentional, willful, and in flagrant disregard of Plaintiff's rights. The County, through its officials, knew or should have known that penalizing an employee for making public records requests, reporting misconduct, or contacting oversight bodies is unlawful. Instead of correcting course, the County doubled down, with multiple layers of management complicit in the retaliation. From the Major and Captain at AOB to the Assistant Director and even the Chief who approved the transfer.

102.    The adverse actions against Plaintiff occurred in close temporal proximity to Plaintiff's protected activities and were openly justified by reference to those activities, i.e. counseling him for emailing the mayor and transferring him for being a "disruption" right after he complained about wrongdoing. Such direct evidence of retaliatory motive is rare and underscores the egregious nature of Defendant's conduct.

**COUNT I**
**RACE DISCRIMINATION**
**(FCRA, Fla. Stat. § 760.10(1)(a))**
**(Against All Defendants)**

103.    Plaintiff reincorporates the factual allegations in Paragraphs 16 through 102.

104.    The FCRA prohibits employment discrimination against an individual with respect to compensation, terms, conditions, or privileges of employment because of the individual's race. § 760.10(1)(a), Fla. Stat.

105.    Plaintiff is Caucasian of non-Latin ethnicity. Defendants intentionally discriminated against Plaintiff on the basis of race. Defendants subjected Plaintiff to adverse employment actions including removal from the Hostage Negotiation Team (HNT) (with an attendant 5% pay reduction), denial of promotions for which Plaintiff was eligible, and ultimately termination of Plaintiff's employment – all because Plaintiff is White (non-Latin).

106.    In March 2019, Defendant, through Captain Raul Jaime Nuñez, abruptly removed Plaintiff from the HNT without any legitimate cause or explanation, stripping him of his specialized role and the 5% salary incentive that accompanied the assignment. When Plaintiff protested and referenced his Jewish identity, Nuñez retorted, "I don't care and I don't want you on the team, and no Jews are going to need to be saved by you." Shocked, Plaintiff asked if the real reason was that he is "not Latin," to which Nuñez replied, "If the Jews can stick together, the Latins can stick together," signaling an intent to favor Latin employees over Plaintiff due to his different

23

background. This overt statement of bias shows that Plaintiff's race was a motivating factor in the adverse actions against him.

107.    Plaintiff suffered adverse actions: removal from Hostage Team, reprimands, ROC, transfer. In the ensuing months, Plaintiff sought other advancement opportunities, including Field Training Officer and K-9 unit positions, for which he was well-qualified. Each time, Defendants denied Plaintiff these roles and instead selected less qualified candidates who were neither Jewish nor white, demonstrating a continued pattern of favoritism against Plaintiff's protected classes.

108.    The discriminatory culture fostered by Captain Nuñez was evident to others in the department as well. For example, police union representative Dan Howard observed disparate treatment in disciplinary matters, pointedly asking: "Why do the white guy and the black guy get written up and none of the Latins did?" This remark reflected the same ethnic favoritism that Plaintiff experienced, a perception that Latin officers were shielded from punishment while non-Latin (white or black) officers like Plaintiff were singled out for adverse treatment. Such evidence further corroborates that Plaintiff's religion and race were substantial motivating factors in the adverse actions taken against him. Nuñez further stated, *"The Jewish thing is going to hurt us."*

109.    Such admissions establish discriminatory intent. *Bell v. Ga.-Pac. Corp.*, 390 F. Supp. 2d 1182, 1187 (M.D. Fla. 2005).

110.    Similarly situated employees of other races were treated more favorably. Less qualified employees of Latin descent were selected for positions and promotions over Plaintiff. For example, after Plaintiff's removal from the HNT, Defendant replaced him with a less qualified Latin employee, and in promotional decisions Defendants chose non-white candidates with inferior qualifications instead of Plaintiff.

111. Defendants' actions as described above constitute intentional discrimination on the basis of race, in clear violation of the Florida Civil Rights Act, Fla. Stat. § 760.10(1)(a). By removing Plaintiff from a coveted assignment, stripping him of pay, and denying him promotions because he is White and because he is not of Latin heritage, Defendant unlawfully altered the terms, conditions, and privileges of Plaintiff's employment due to discriminatory animus. As a direct result, Plaintiff has suffered loss of income, loss of career advancement opportunities, humiliation, and other damages. Plaintiff accordingly demands all relief available under the FCRA, including back pay, compensatory damages, prejudgment interest, equitable relief, and attorney's fees – to fully redress this egregious violation of his civil rights.

112. Plaintiff further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT II**
**RELIGIOUS DISCRIMINATION**
**(FCRA, Fla. Stat. § 760.10(1)(a))**
**(Against All Defendants)**

113. Plaintiff reincorporates the factual allegations in Paragraphs 16 through 102.

114. Under Fla. Stat. § 760.10(1)(a), it is unlawful for an employer to discriminate against an individual in employment because of the individual's religion.

115. Plaintiff is Jewish and belongs to a protected class based on religion.

116. Plaintiff's Jewish faith was known to Defendants, and Plaintiff was at all times qualified for his position and met Defendants' legitimate job expectations.

117. At all relevant times, he was qualified for his position and performed his duties competently, including serving on the elite Hostage Negotiation Team as its only Jewish negotiator, where he brought specialized expertise in communicating with Jewish community members.

118.    Defendants discriminated against Plaintiff on the basis of religion (Jewish). Defendants subjected Plaintiff to adverse employment actions – including removal from the HNT (resulting in a loss of the 5% specialty pay), denial of promotional opportunities, and ultimately termination – because Plaintiff is Jewish. These actions were taken solely due to Plaintiff's religion, rather than any legitimate performance-based reason.

119.    Defendants treated non-Jewish employees more favorably than Plaintiff. Less qualified employees who were not Jewish were selected for advancement and allowed to remain in coveted roles that Plaintiff was denied. For example, Defendants promoted individuals of other faiths with inferior qualifications over Plaintiff, and after removing Plaintiff from the HNT, Defendants filled that position with a colleague who was not Jewish.

120.    Direct evidence reveals a strong anti-Jewish animus behind Defendants 'actions. Upon removing Plaintiff from the HNT, one of Defendants' supervisors told him that *"no Jews are going to need to be saved by you,"* a derogatory remark explicitly targeting Plaintiff's Jewish faith. Shocked, Plaintiff asked if the real reason was that he is "not Latin," to which Nuñez replied, "If the Jews can stick together, the Latins can stick together." This statement underscores that Plaintiff's religion was a determining factor in Defendants' decision to strip him of assignments and ultimately terminate his employment.

121.    Defendants' actions as described above constitute intentional discrimination on the basis of religion, in clear violation of the Florida Civil Rights Act, Fla. Stat. § 760.10(1)(a). By removing Plaintiff from a coveted assignment, stripping him of pay, and denying him promotions because he is Jewish and because he is not of Latin heritage, Defendants unlawfully altered the terms, conditions, and privileges of Plaintiff's employment due to discriminatory animus. As a direct result, Plaintiff has suffered loss of income, loss of career advancement opportunities,

humiliation, and other damages. Plaintiff accordingly demands all relief available under the FCRA, including back pay, compensatory damages, prejudgment interest, equitable relief, and attorney's fees – to fully redress this egregious violation of his civil rights.

122. Plaintiff further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT III**
**RETALIATION**
**(FCRA, Fla. Stat. § 760.10(7))**
**(Against All Defendants)**

123. Plaintiff reincorporates the factual allegations in Paragraphs 16 through 102.

124. Plaintiff engaged in statutorily protected activity by opposing and reporting unlawful discrimination in the workplace. It is an unlawful employment practice under the FCRA for an employer to retaliate against a person because he has opposed any practice made unlawful by the FCRA or has participated in an investigation of such practices. Because the FCRA's anti-retaliation provision mirrors its federal counterpart, Florida courts apply federal Title VII standards to FCRA retaliation claims.

125. After Plaintiff voiced his opposition to discrimination, Defendants subjected him to adverse employment actions, including unwarranted discipline and ultimately termination. These actions would dissuade a reasonable person from complaining about discrimination and therefore qualify as adverse employment actions under the law. The temporal proximity between Plaintiff's protected activity and Defendants' retaliation, among other facts, demonstrates a causal connection between the two.

126. Defendant took adverse employment actions against Plaintiff after he engaged in protected activity. The adverse actions identified earlier (counseling, suspension, transfer, etc.) all qualify as adverse actions under the FCRA's retaliation standard.

27

127. There is a close causal connection between Plaintiff's protected activity and the adverse actions. As detailed, the timing is suspiciously close: e.g., within weeks of complaining to the mayor, he's counseled; within a month of filing an Ethics complaint, he's transferred; within a short time of cooperating with investigators, he faces ongoing hostility. The County's retaliatory intent was openly expressed i.e. calling him disruptive after complaints, punishing him for complaining.

128. Florida courts have recognized that a "causal link" for FCRA retaliation can be inferred from close timing and evidence of retaliatory animus (*Russell v. KSL Hotel Corp.*, 887 So.2d 372 (Fla. 3d DCA 2004)). Here, animus is evidenced by the direct statements of annoyance and reprisal by Plaintiff's bosses. For example, Major Villalba essentially told Plaintiff to stop going outside the department, indicating hostility to his protected expression. Capt. Nuñez's call to remove Plaintiff indicates a desire to retaliate, not a legitimate business decision.

129. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered and will continue to suffer lost wages, benefits, emotional distress, and other tangible and intangible damages.

130. Plaintiff further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT IV**
**§ 11A-26(1), Code of Miami-Dade County**
*MDHRO National Origin Discrimination*
**(Against All Defendants)**

131. Plaintiff reincorporates the factual allegations in Paragraphs 16 through 102.

132. The MDHRO prohibits discrimination with respect to the training, hire, tenure, promotion, transfer, terms, conditions, wages, benefits, or privileges of employment, or in any

other matter related to employment because of an individual's race, color, and national origin. Miami-Dade County, Fla., Code, ch. 11A, art. IV, § 11A–26(1).

133.    Plaintiff is Caucasian of non-Latin ethnicity. Defendants intentionally discriminated against Plaintiff on the basis of race. Defendants subjected Plaintiff to adverse employment actions including removal from the Hostage Negotiation Team (HNT) (with an attendant 5% pay reduction), denial of promotions for which Plaintiff was eligible, and ultimately termination of Plaintiff's employment – all because Plaintiff is White (non-Latin).

134.    In March 2019, Defendants, through Captain Raul Jaime Nuñez, abruptly removed Plaintiff from the HNT without any legitimate cause or explanation, stripping him of his specialized role and the 5% salary incentive that accompanied the assignment. When Plaintiff protested and referenced his Jewish identity, Nuñez retorted, "I don't care and I don't want you on the team, and no Jews are going to need to be saved by you." Shocked, Plaintiff asked if the real reason was that he is "not Latin," to which Nuñez replied, "If the Jews can stick together, the Latins can stick together," signaling an intent to favor Latin employees over Plaintiff due to his different background. This overt statement of bias shows that Plaintiff's race was a motivating factor in the adverse actions against him.

135.    Plaintiff suffered adverse actions: removal from Hostage Team, reprimands, ROC, transfer. In the ensuing months, Plaintiff sought other advancement opportunities, including Field Training Officer and K-9 unit positions, for which he was well-qualified. Each time, Defendants denied Plaintiff these roles and instead selected less qualified candidates who were neither Jewish nor white, demonstrating a continued pattern of favoritism against Plaintiff's protected classes.

136.    The discriminatory culture fostered by Captain Nuñez was evident to others in the department as well. For example, police union representative Dan Howard observed disparate

treatment in disciplinary matters, pointedly asking: "Why do the white guy and the black guy get written up and none of the Latins did?" This remark reflected the same ethnic favoritism that Plaintiff experienced, a perception that Latin officers were shielded from punishment while non-Latin (white or black) officers like Plaintiff were singled out for adverse treatment. Such evidence further corroborates that Plaintiff's religion and race were substantial motivating factors in the adverse actions taken against him. Nuñez further stated, *"The Jewish thing is going to hurt us."*

137.    Such admissions establish discriminatory intent. *Bell v. Ga.-Pac. Corp.*, 390 F. Supp. 2d 1182, 1187 (M.D. Fla. 2005). Similarly situated employees of other races were treated more favorably. Less qualified employees of Latin descent were selected for positions and promotions over Plaintiff. For example, after Plaintiff's removal from the HNT, Defendant replaced him with a less qualified Latin employee, and in promotional decisions Defendants chose non-white candidates with inferior qualifications instead of Plaintiff.

138.    The discriminatory actions of Defendants against Plaintiff, as described and set forth above, constitute an adverse employment action for purposes of the MDCO.  In subjecting Plaintiff to adverse employment actions, Defendants intentionally discriminated against Plaintiff with respect to the compensation, terms, conditions, or privileges of his employment.

139.    As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the MDHRO, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

140. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the MDCO, warranting the imposition of punitive damages in addition to compensatory damages.

141. The conduct of Defendants deprived Plaintiff of his statutory rights guaranteed under the MDCO.

142. Plaintiff further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT V**
**§ 11A-26(1), Code of Miami-Dade County**
*MDHRO Religious Discrimination*
**(Against All Defendants)**

143. Plaintiff reincorporates the factual allegations in Paragraphs 16 through 102.

144. The MDHRO prohibits discrimination with respect to the training, hire, tenure, promotion, transfer, terms, conditions, wages, benefits, or privileges of employment, or in any other matter related to employment because of an individual's religion. Miami-Dade County, Fla., Code, ch. 11A, art. IV, § 11A–26(1).

145. Plaintiff is Jewish and belongs to a protected class based on religion.

146. Plaintiff's Jewish faith was known to Defendants, and Plaintiff was at all times qualified for his position and met Defendants' legitimate job expectations

147. At all relevant times, he was qualified for his position and performed his duties competently, including serving on the elite Hostage Negotiation Team as its only Jewish negotiator, where he brought specialized expertise in communicating with Jewish community members.

148. Defendants discriminated against Plaintiff on the basis of religion (Jewish). Defendants subjected Plaintiff to adverse employment actions – including removal from the HNT (resulting in a loss of the 5% specialty pay), denial of promotional opportunities, and ultimately

31

termination – because Plaintiff is Jewish. These actions were taken solely due to Plaintiff's religion, rather than any legitimate performance-based reason.

149.    Defendants treated non-Jewish employees more favorably than Plaintiff. Less qualified employees who were not Jewish were selected for advancement and allowed to remain in coveted roles that Plaintiff was denied. For example, Defendants promoted individuals of other faiths with inferior qualifications over Plaintiff, and after removing Plaintiff from the HNT, Defendants filled that position with a colleague who was not Jewish.

150.    Direct evidence reveals a strong anti-Jewish animus behind Defendants' actions. Upon removing Plaintiff from the HNT, one of Defendant's supervisors told him that *"no Jews are going to need to be saved by you,"* a derogatory remark explicitly targeting Plaintiff's Jewish faith. Shocked, Plaintiff asked if the real reason was that he is "not Latin," to which Nuñez replied, "If the Jews can stick together, the Latins can stick together." This statement underscores that Plaintiff's religion was a determining factor in Defendants' decision to strip him of assignments and ultimately terminate his employment.

151.    The discriminatory actions of Defendants against Plaintiff, as described and set forth above, constitute an adverse employment action for purposes of the MDCO.  In subjecting Plaintiff to adverse employment actions, Defendants intentionally discriminated against Plaintiff with respect to the compensation, terms, conditions, or privileges of his employment.

152.    As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the MDHRO, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages, back

pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

153. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the MDCO, warranting the imposition of punitive damages in addition to compensatory damages.

154. The conduct of Defendants deprived Plaintiff of his statutory rights guaranteed under the MDCO.

155. Plaintiff further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT VI**
**§ 11A-43(1), Code of Miami-Dade County**
*MDHRO Retaliation*
**(Against All Defendants)**

156. Plaintiff reincorporates the factual allegations in Paragraphs 16 through 102.

157. The MDHRO prohibits retaliation in any manner against a person who has opposed an unlawful practice, has filed a complaint, or participated in any investigation, proceeding or hearing related to an unlawful practice. Miami-Dade County, Fla., Code, ch. 11A, art. IV, § 11A–43(1).

158. Plaintiff engaged in a protected activity when he opposed Defendants' unlawful discriminatory conduct on the basis of his national origin and religion and complained about the unlawful discrimination he was experiencing.

159. After Plaintiff voiced his opposition to discrimination, Defendants subjected him to adverse employment actions, including unwarranted discipline and ultimately termination. These actions would dissuade a reasonable person from complaining about discrimination and therefore qualify as adverse employment actions under the law. The temporal proximity between

Plaintiff's protected activity and Defendants' retaliation, among other facts, demonstrates a causal connection between the two.

160.    Defendants took adverse employment actions against Plaintiff after he engaged in protected activity. The adverse actions identified earlier (counseling, suspension, transfer, etc.) all qualify as adverse actions under the FCRA's retaliation standard.

161.    There is a close causal connection between Plaintiff's protected activity and the adverse actions. As detailed, the timing is suspiciously close: e.g., within weeks of complaining to the mayor, he's counseled; within a month of filing an Ethics complaint, he's transferred; within a short time of cooperating with investigators, he faces ongoing hostility. The County's retaliatory intent was openly expressed i.e. calling him disruptive after complaints, punishing him for complaining.

162.    The discriminatory actions of Defendants against Plaintiff, as described and set forth above, constitute an adverse employment action for purposes of the MDCO.  In subjecting Plaintiff to adverse employment actions, Defendants intentionally discriminated against Plaintiff with respect to the compensation, terms, conditions, or privileges of his employment.

163.    Defendants took the above-mentioned materially adverse actions, among others, against Plaintiff because of his protected activities.

164.    As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the MDHRO, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff accordingly demands lost economic damages, lost wages, back

pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

165.    Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the MDCO, warranting the imposition of punitive damages in addition to compensatory damages.

166.    The conduct of Defendants deprived Plaintiff of his statutory rights guaranteed under the MDCO.

167.    Plaintiff further requests that his attorney's fees and costs be awarded as permitted by law.

## COUNT VII
## RETALIATION
### (Miami-Dade County Employee Protection Ordinance, Code §§ 2-56.28.11 – 2-56.28.17)
### (Against All Defendants)

168.    Plaintiff reincorporates the factual allegations in Paragraphs 16 through 102.

169.    At all relevant times, Plaintiff was an employee of Miami-Dade County entitled to the protections of the County's Employee Protection Ordinance (Miami-Dade County Code §§ 2-56.28.11–2-56.28.17). Under this ordinance, the County "shall not dismiss, discipline, or take any other adverse personnel action against an employee" for disclosing certain types of information, including violations of local, state, or federal law that present a substantial danger to public health or safety, or acts of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, or neglect of duty.

170.    Plaintiff made disclosures to Defendants' management of information he reasonably believed evidenced unlawful conduct, gross mismanagement, and/or abuse of public funds by County officials, information protected under the Employee Protection Ordinance.

35

Plaintiff's reports of such serious misconduct by the County and its agents constituted statutorily protected disclosures under the ordinance.

171.    In direct retaliation for Plaintiff's protected disclosures, Defendants took adverse personnel actions against him, including unwarranted disciplinary actions and eventual termination of his employment. These actions were intended to punish Plaintiff for, and deter him from, reporting official wrongdoing. Such retaliatory conduct by the County is expressly prohibited by the Employee Protection Ordinance and violates Miami-Dade County Code § 2-56.28.13. To establish a claim under this ordinance (analogous to Florida's Whistle-Blower Act), Plaintiff must show that he engaged in protected activity, that he suffered an adverse personnel action, and that the adverse action was causally linked to his protected activity. Plaintiff has satisfied these elements, as the timing and circumstances of Defendants' actions demonstrate a direct causal connection between Plaintiff's disclosures and the retaliation.

172.    As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has sustained and will continue to sustain economic losses, damage to his career and reputation, mental anguish, and other compensatory damages.

173.    Plaintiff further requests that his attorney's fees and costs be awarded as permitted by law.

### COUNT VIII
### FLORIDA WHISTLEBLOWER ACT
### (Fla. Stat. §§ 112.3187 – 112.3189)
### (Against Defendant Miami-Dade Sheriff's Office)

174.    Plaintiff reincorporates the factual allegations in Paragraphs 16 through 102.

175.    This is a cause of action for unlawful retaliation under Florida's public-sector Whistle-Blower's Act, § 112.3187, Florida Statutes (the "FWA"). The FWA prohibits state or local government agencies from taking adverse personnel action against an employee "for disclosing

information pursuant to the provisions of [the Act]." The Act further forbids any retaliation against an employee who has disclosed protected information under its terms. Miami-Dade County is an "agency" and "employer" subject to § 112.3187.

176. Plaintiff engaged in numerous protected disclosures of information under the FWA. Florida law protects an employee who "discloses information to an appropriate agency" alleging any violation or suspected violation of law, rule, or regulation by an agency or independent contractor, or any abuse of authority, gross waste of funds, or gross mismanagement. Plaintiff's activities fell squarely within this protection, in particular requesting public records regarding MDSO's overtime audit and policies.

177. "The act of petitioning the government for redress, including submitting public records requests, is protected under the First Amendment's Petition Clause." See *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011); *Doe v. Valencia Coll. Bd. of Trs.*, 903 F.3d 1220, 1231 (11th Cir. 2018). Moreover, submitting a public records request is an act protected under Article I, Section 24 of the Florida Constitution and Chapter 119, Florida Statutes. Retaliation for asserting this statutory right can support a claim of unlawful reprisal. See *O'Boyle v. Town of Gulf Stream*, 257 So. 3d 1036, 1041 (Fla. 4th DCA 2018).

178. Plaintiff filed an internal Career Service grievance in January 2023 contesting what he reasonably believed was an improper application of overtime rules and a disciplinary action taken in bad faith. In his grievance and appeals, Plaintiff effectively disclosed an "improper use of authority" and a "gross mismanagement" of departmental policy.

179. These communications were made to higher authorities within the agency (Major Villalba, the Division Chief, etc.), which qualify under § 112.3187(6) as disclosures to an "appropriate local official." The Florida Supreme Court has directed that the Whistle-blower's Act

is remedial and must be liberally construed in favor of protecting public employees who report wrongdoing. *Irven v. Dep't of Health & Rehab. Servs.*, 790 So. 2d 403, 406–07 (Fla. 2001); see also *Burden v. City of Opa Locka*, 936 So. 2d 20, 23 (Fla. 3d DCA 2006).  Plaintiff's insistence that MDSO correct its erroneous discipline, supported by public records he obtained, was a protected act of whistleblowing.

180.    Plaintiff's email to County Mayor Daniella Levine Cava is a protected disclosure. In that correspondence, Plaintiff reported "instances of unlawful activity, misfeasance, or malfeasance" within MDSO. He explicitly raised issues about MDSO employees not adhering to law. The mayor of Miami-Dade County is indisputably an "appropriate local official" to receive such disclosures, as she has oversight authority over County departments. Reporting concerns to an elected official, such as the County mayor, is a protected disclosure under Fla. Stat. § 112.3187(6), which expressly includes "any member of the governing body of the local governmental entity." See also *Burden v. City of Opa Locka*, 936 So. 2d 20, 23 (Fla. 3d DCA 2006). The Florida Supreme Court in *Irven v. Dept. of HRS* made clear that disclosures to agency heads or officials in position to remedy wrongdoing are protected and that the statute must be read broadly in favor of coverage.

181.    Plaintiff made an internal report to the Professional Compliance Bureau accusing Lt. Paul Angelo of committing a wrongful act of a false arrest on July 8, 2023. This report constituted a disclosure of an alleged "violation of any…law, rule, or regulation committed by an employee or agent of an agency," as defined by Fla. Stat. § 112.3187(5)(a), and is therefore protected activity under the Florida Whistle-blower's Act. The fact that PCB later deemed the complaint "unsubstantiated" does not strip Plaintiff's report of protection. Under the Florida Whistle-blower's Act, an employee's disclosure is protected so long as the employee had a good

faith, reasonable belief that the conduct reported constituted misconduct, even if the allegation is later found to be unproven. See *Irven v. Dep't of Health & Rehab. Servs.*, 790 So. 2d 403, 406 (Fla. 2001); *Burden v. City of Opa Locka*, 936 So. 2d 20, 23 (Fla. 3d DCA 2006).

182.    Plaintiff filed a complaint with the Miami-Dade Ethics Commission alleging violations of the County's ethics and employee protection ordinances. The Ethics Commission is explicitly an appropriate agency to receive whistleblower disclosures. This disclosure to an external watchdog is core protected activity under § 112.3187(6). Additionally, Plaintiff's communications with the Public Records Unit and others in April 2025 to assist the Ethics investigation were part of participating in an investigation, which is also protected under the Act (and under Fla. Stat. § 112.3188 which ensures confidentiality and protection for whistleblowers during investigations).

183.    Defendant Miami-Dade County, through MDSO, took adverse personnel actions against Plaintiff after, and because of, his protected activities, including, but not limited to, record of counseling, unfavorable transfer, removal from favorable assignments and divisions, suspension without pay, hostile, retaliatory work environment.

184.    Plaintiff's protected activity was the motivating factor for the adverse actions against him. The temporal proximity between his disclosures and the retaliation, coupled with explicit statements by Defendant's agents, establishes a causal connection.

185.    All elements of a Florida Whistle-Blower Act claim are thus met. Plaintiff (1) made protected disclosures of specified information; (2) suffered adverse employment actions; and (3) the disclosures were causally linked to the adverse actions. Plaintiff's disclosures were not knowingly false or made in bad faith.

186. By dismissing, disciplining, suspending, transferring, and otherwise retaliating against Plaintiff for his protected disclosures, Defendant violated Fla. Stat. § 112.3187(4)(a).

187. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered and will continue to suffer lost wages, benefits, emotional distress, and other tangible and intangible damages.

188. Plaintiff further requests that his attorney's fees and costs be awarded as permitted by law.

## COUNT IX
## MIAMI-DADE EMPLOYEE PROTECTION ORDINANCE
### (Miami-Dade County Code §§ 2-56.28.11 – 2-56.28.17)
### (Against Defendants Miami-Dade Sheriff's Office and Miami-Dade County, Florida)

189. Plaintiff reincorporates the factual allegations in Paragraphs 16 through 102.

190. In addition to state law, Defendant's retaliatory actions violate the Miami-Dade County "Protection of Employees Disclosing Specified Information" Ordinance, Miami-Dade County Code §§ 2-56.28.11 – 2-56.28.17 (the "Employee Protection Ordinance" or "EPO"). This local law provides similar or greater protections to County employees against retaliation for whistleblowing. Specifically, § 2-56.28.13 of the County Code states: *"The County shall not dismiss, discipline, or take any other adverse personnel action against an employee in retaliation for the employee's disclosure of information under this division."* The Ordinance defines "disclosure" consistently with state law. Under Miami-Dade County Code § 2-56.28.11, disclosures include formal or informal reports of "gross mismanagement, malfeasance, misfeasance, gross waste of public funds, or a violation of a law, rule, or regulation," made to appropriate officials. It also defines "adverse personnel action" broadly to include termination, suspension, transfer, demotion, withholding of bonuses, reduction in pay or benefits, or any other adverse action in the employment context.

40

191.     At all relevant times, Defendant Miami-Dade County acted through its agencies, departments, officials, and employees, including the Miami-Dade Sheriff's Office, which functions as a County law-enforcement agency for purposes of employment, discipline, and personnel actions. All acts complained of herein were undertaken within the course and scope of Defendants' authority and employment, rendering Miami-Dade County liable under principles of agency, respondeat superior, and the express provisions of the County Code.

192.     Plaintiff's conduct as described in Count V constitutes protected activity under the County's EPO as well. The legislative intent of § 2-56.28.11 is to encourage County employees to report unlawful or improper practices without fear of reprisal. The Ordinance protects disclosures of "specified information," which includes "unlawful activity, misfeasance, malfeasance" by the County or its contractors. In 1994, when enacting this Ordinance, the County Commission mandated that it be interpreted in line with the state Whistle-Blower's Act but can provide additional local remedies. All of Plaintiff's whistleblowing (reporting overtime irregularities, public records issues, false arrest, etc.) falls under "unlawful activity or misfeasance" by County employees.

193.     Under the County Ordinance, the retaliatory acts against Plaintiff clearly qualify as adverse personnel actions. The ordinance explicitly names suspension and transfer as adverse actions, both of which Plaintiff experienced:

194.     The Miami-Dade County Employee Protection Ordinance prohibits adverse actions taken in retaliation for an employee's disclosure of protected information. See Miami-Dade County Code § 2-56.28.13.  The evidence reviewed in Count V demonstrates that Plaintiff's disclosures were the *but-for cause*, or at least a motivating cause, of the County's actions against him. The Ordinance does not require Plaintiff to demonstrate an exclusive causation, if retaliation was a

substantial factor, liability attaches. The direct temporal proximity and explicit retaliatory statements (e.g., calling his complaint "vindictive", calling him a "disruption" after his protected acts) show the nexus.

195.    By disciplining, suspending, and transferring Plaintiff in reprisal for his protected disclosures, Defendants Miami-Dade Sheriff's Office and Miami-Dade County, Florida violated Miami-Dade County Code § 2-56.28.13.

196.    The EPO prohibits retaliation for disclosing violations of law, rule, or regulation.

197.    Plaintiff disclosed misconduct and was punished.

198.    As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered and will continue to suffer lost wages, benefits, emotional distress, and other tangible and intangible damages.

199.    Plaintiff further requests that his attorney's fees and costs be awarded as permitted by law.

**COUNT X**
**Violation of Florida's Public Records Act and Article I, § 24 of the Florida Constitution**
**(Retaliation & Enforcement)**
**(Against Defendants Miami-Dade Sheriff's Office and Miami-Dade County, Florida)**

200.    Plaintiff reincorporates the factual allegations in Paragraphs 16 through 102.

201.    Florida's Constitution and the Public Records Act (Chapter 119, Florida Statutes) guarantee every person the right to inspect or copy public records of their government. Article I, Section 24(a) of the Florida Constitution provides: *"Every person has the right to inspect or copy any public record made or received in connection with the official business of any public body, officer, or employee of the state, or persons acting on their behalf…"* (subject to certain exceptions).

202.     At all relevant times, Miami-Dade County was a "public body" and "agency" subject to Article I, § 24 of the Florida Constitution and Chapter 119, Florida Statutes. The Miami-Dade Sheriff's Office acted as a County agency and records custodian for purposes of responding to public records requests and enforcing personnel actions. All acts and omissions described herein were undertaken by County employees and officials acting within the course and scope of their authority, rendering Miami-Dade County liable for violations of the Florida Public Records Act and related retaliatory conduct.

203.     The Florida Public Records Act requires agencies to promptly provide access to public records upon request, and by prohibiting agencies from refusing access except as authorized by law. Implicit in these provisions is that no person should be punished for exercising their right to public records. Retaliation against an individual for making a public records request offends the public policy of openness and accountability that underpins Article I, § 24 and Chapter 119.

204.     Defendants Miami-Dade County, Florida and the Miami-Dade Sheriff's Office, acting jointly and through County employees and officials, unlawfully retaliated against Plaintiff for exercising his constitutional and statutory right to request public records. Florida Statutes § 119.07(1)(a) mandates that custodians of public records "shall permit" them to be inspected and copied by any person who desires. The law does not countenance any penalty or adverse consequence for making such requests; in fact, it encourages citizens to utilize the Public Records Act to promote government transparency.

205.     Defendants, however, when faced with Plaintiff's persistent public records requests, responded not with compliance, but with reprisal. The Record of Counseling on July 5, 2023, explicitly cited Plaintiff's act of discussing public records issues outside the chain (to the mayor) as misconduct.

206.     The transfer of Plaintiff came shortly after Plaintiff filed or was believed to have filed a public records request on September 4, 2023, for the emails supporting his transfer. Here, the timing is too aligned to ignore. The moment Plaintiff sought via a PRR to get evidence of internal machinations; he was expunged from the unit. That is retaliatory and unlawful.

207.     To the extent Defendants' liability in this Count is also predicated on failure to comply with public records laws, Plaintiff pleads that MDSO violated Fla. Stat. § 119.07(1) by failing to timely provide certain records which Plaintiff requested, namely:

(a) the full overtime audit report requested by the union/Plaintiff in 2022 (provided only in 2023 after multiple appeals). There was no valid exemption given for withholding it prior to the hearing and doing so prejudiced Plaintiff;

(b) emails between Captain Nuñez and Chief Castro from August 27-28, 2023, regarding Plaintiff's transfer, which if not provided via the PRR Plaintiff attempted, were eventually produced to the Ethics Commission in January 2025.

208.     By withholding or delaying such records, the County violated the requirement of prompt production.

209.     The adverse actions described were undertaken, in part, because of Plaintiff's public records requests and related advocacy. This violates the public policy embodied in the Act that citizens be free to assert their right of access. The Eleventh Circuit has recognized that accessing or requesting information from public officials is protected under the First Amendment. See *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); see also *Lambert v. City of Dumas*, 187 F.3d 931, 936–37 (8th Cir. 1999).

210.    Plaintiff's requests were a motivating factor in Defendants' decision to take adverse action. The County's agents essentially admitted being upset by Plaintiff's insistence on his rights. Temporal proximity buttresses causation.

211.    Plaintiff suffered irreparable injury to his constitutional and statutory rights by Defendants' retaliatory acts. Plaintiff respectfully requests an award of his reasonable attorneys' fees and court costs as authorized by Article I, Section 24 of the Florida Constitution and Florida's Public Records Act (Chapter 119, Florida Statutes). Florida's fee-shifting statute for public records, § 119.12, expressly mandates that when an agency is found to have "unlawfully refused" to permit a public record to be inspected, "the court shall assess and award, against the agency responsible, the reasonable costs of enforcement, including attorney's fees." This prevailing-party entitlement is mandatory under Florida law, a prevailing public-records requester must be awarded his attorneys' fees and costs even if the agency acted in good faith or without willful intent *See Bd. of Trustees, Jacksonville Police & Fire Pension Fund v. Lee*, 189 So. 3d 120, 125 (Fla. 2016) (confirming that § 119.12 requires fees to a prevailing requester with no "good faith" exception); *Office of State Att'y v. Gonzalez*, 953 So. 2d 759, 764 (Fla. 2d DCA 2007) (same principle, no honest mistake defense); *Consumer Rights, LLC v. Union Cnty.*, 159 So. 3d 882, 884–85 (Fla. 1st DCA 2015) (affirming prevailing requester's right to fees).

212.    Plaintiff further requests that his attorney's fees and costs be awarded as permitted by law.

**JURY DEMAND**

Plaintiff hereby demands a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment against Defendants for all damages suffered by the Plaintiff, including economic damages, lost wages (back pay and front pay) and benefits, liquidated damages, statutory damages, compensatory damages, emotional distress damages, punitive damages, interest, attorney's fees and costs, disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as a result of the Defendant's conduct in violation of the FCRA, MDCO, FWA, EPO, and FPRA.

Date:   March 23, 2026
      Miami, Florida

Respectfully submitted,

**DEREK SMITH LAW GROUP, PLLC.**
*Attorneys for Plaintiff*

*/s/ Daniel J. Barroukh*
Daniel J. Barroukh, Esq.
Florida Bar No.: 1049271
Derek Smith Law Group, PLLC
520 Brickell Key Drive, Suite O-301
Miami, FL 33131
Tel: (305) 946-1884
Fax: (305) 503-6741
Danielb@dereksmithlaw.com

46

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true and correct copy of the foregoing document is being served on March 23, 2026, on Madonna M. Snowden of FordHarrison LLP, 300 South Orange Avenue, Suite 1300, Orlando, FL 32801, Email: msnowden@fordharrison.com, and Marc A. Sugerman, FordHarrison LLP, 300 South Orange Avenue, Suite 1300, Orlando, FL 32801, Email: msugerman@fordharrison.com, via CM/ECF, and on Eric A. Rodriguez of Geraldine Bonzon-Keenan, 111 NW 1st Street, Suite 2810, Miami, FL 33128, Email: ear2@miamidade.gov, via electronic mail.

By: */s/ Daniel J. Barroukh*
Daniel J. Barroukh, Esq.

47